Filed 6/24/21  P. v. Sanchez CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHNNY JOSUE SANCHEZ,<br><br>    Defendant and Appellant. | B302549<br><br>Los Angeles County<br>Super. Ct. No. BA447545<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION<br>FOR REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on May 28, 2021, be modified as follows:

1.      On page 18, the second sentence of the third full paragraph is deleted, and the following is inserted in its place: "The only lunch period during deliberations would have been the next day, Thursday."

2.      On page 24, the second full sentence at the top of the page is deleted, and the following is inserted in its place:

"We do not second-guess the trial court's conclusion that Juror No. 2 was credible when she testified under oath that none of the alternate's statements came up in the jury room."

3. On page 24, the third sentence from the end of the first paragraph is deleted, and the following is inserted in its place:

"Defense counsel urged the trial court to "rely on its gut, experience" despite the jurors' testimony they did not have improper conversations."

4. On page 28, the first sentence of the last paragraph is deleted, and the following is inserted in its place:

"Sanchez has not demonstrated prejudice to his full ability to defend against the murder and attempted murder charges of which he already had been convicted."

There is no change in the judgment.

Appellant's petition for rehearing, filed on June 14, 2021, is denied.

_____
EGERTON, J.          LAVIN, Acting P. J.          ADAMS, J.*

_____
\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 5/28/21  P. v. Sanchez CA2/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B302549 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA447545 |
| JOHNNY JOSUE SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stephanie A. Miyoshi and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Johnny Josue Sanchez of five counts of special circumstance murder and two counts of willful, deliberate, and premeditated attempted murder, after a deadly fire in the abandoned building where Sanchez and others lived. He appeals, arguing prejudicial juror misconduct, a violation of his right to be present, the improper exclusion and admission of evidence, insufficient evidence of a "kill zone," an improper "kill zone" instruction, and prosecutorial misconduct. We affirm.

**BACKGROUND**

An information charged Sanchez with five counts of murder: DeAndre Mitchell (count 1); Jerry Dean Clemons (count 2); Mary Ann Davis (count 3); Joseph Proenneke (count 4); and Tierra Stansberry (count 5) (Pen. Code, § 187, subd. (a)[1]). All five murder counts alleged the special circumstances that Sanchez committed multiple murders, while engaged in committing arson. (§ 190.2, subds. (a)(3), (a)(17).) The information also charged Sanchez with the attempted, willful, deliberate, and premeditated murder of Anthony Roberts (count 6) and Robert Fernandez (count 7) (§ 664/187, subd. (a)).

**1.** ***Prosecution case***

a. *Fire department and law enforcement testimony*

In early June 2016, Assistant Chief Jaime Moore of the City of Los Angeles Fire Department (LAFD) met with the owner of an abandoned building at 2411 West Eighth Street, to discuss the homeless people living inside. All utilities were shut off and the owner awaited city permission to tear the building down.

When Chief Moore returned on June 13, the building was on fire. Two fire trucks and three fire engines responded,

---

[1] All statutory references are to the Penal Code.

2

three aerial ladders went to the roof, firefighting lines sent pumped water into the building, and firefighters used a wooden ladder to rescue people from second-story windows in the alley. Almost immediately, firefighters found a dead body in the second-floor hallway. A woman pulled on Chief Moore's coat and told him her friends were still inside. He stayed for almost 24 hours, and the next day specialized K-9 dogs found more bodies.

Chief Moore did not worry that homeless people living in the building would start a fire by smoking or using candles, but he was concerned they would get hurt in the unsafe interior. He was not aware of data showing homeless people were more likely to start accidental fires.

LAFD Captain David Lindsay and his company responded to the scene around dinnertime. Fire and smoke were coming out of windows on the alley side of the building, and people in the alley and in the upstairs windows were screaming for help. Firefighters forced the front doors open, and Lindsay's company went inside and saw fire on the concrete stairs to the second floor. Because concrete does not burn, he believed something was on the stairs to burn, and this was not an accidental fire. They put out the stair fire and went upstairs, where an enormous fire was free-burning in the hallway. The floor was extremely hot. They found a body in the hallway but had to keep fighting the fire while two firefighters dragged the body back. They could not get far because the fire was so hot, and the tanks on their breathing apparatus began to run out of air. A security door had been blown off its hinges, perhaps by a rapid rise of heat causing a "flashover," when smoke itself lights up and explodes.

The fire moved quickly through the building. It took three hours to put it out. A fast-moving fire could be caused

by deliberately starting fires in multiple locations, and by using accelerants.

LAFD Captain Mark Soto was on a fire engine that responded to the fire just after 7:00 p.m.  Smoke was coming out of the front and alley sides of the second floor.  As he entered with his team and hose, he saw fire on the concrete stairs, which was unusual because there was not much to burn.  A male Hispanic with short hair wearing jean shorts and no shirt was inside.  Captain Soto told him to leave the building, but he turned away and walked back inside.

They took two water lines up the stairs, but the second-floor fire was too big, and they had to back out of one room because of the intense heat.  They pulled out when the incident commander sent in heavier streams.  The firefighters gave up on saving the building, pulled everyone out, and went into defensive mode to protect surrounding structures.

A firefighter saw people in the alley pointing up at someone yelling from a second-floor window on the alley side.  He put a 20-foot extendable ladder up to the window, broke the glass, and helped a Black woman and a Hispanic man down.  Someone else yelled his brother was in another room in the back, and the firefighter saw a hand hanging out of the window between security bars.  He put the ladder up to that window, and another firefighter climbed up and cut the bars with a rotary saw.

When the second firefighter learned someone was trapped in a window on the second floor, he ran past two Hispanic men fighting in the alley, went up the ladder to the window, used the saw to cut the bars, and helped the man out.  The man had cut his arm on some metal and nearly passed out.  The firefighter carried him down and dragged him to the street corner.  When

4

he went back inside and up the stairs to help pull hose, other firefighters handed him a dead body too badly charred to bring out into the street.  He left the body at the bottom of the stairs.

A Los Angeles Police Department (LAPD) officer arrived at the scene, and Nivea and Flaco[2] pointed at Sanchez, who had a shirt wrapped around his nose and mouth.  Nivea said: " 'That's the guy who started the fire.  That's the guy,' " and she said Sanchez had threatened to jump her.  Sanchez, with lacerations on his face, was standing in the mouth of the alley.  His fists were clenched and he was swaying back and forth.  Looking at the officer, he threw his shirt on the ground.  She handcuffed him and he was placed under arrest.  A large gas lighter you could buy at a smoke shop and a pipe were in his pocket.

The next morning, firefighters entered the burned-out building with cadaver dogs, who alerted to a spot in an upstairs room secured from the inside.  The bodies of Clemons, Davis, Proenneke, and Stansberry lay under three to four feet of debris.  The four victims were huddled together as if asleep, on blankets and a sleeping bag stacked on a tarp.  The medical examiner testified Proenneke had burns on 15 percent of his body, and he died from the burns, carbon monoxide poisoning, and smoke inhalation.  Clemons had burns on most of his back, and died of carbon monoxide poisoning, smoke inhalation, and burns.  Davis died of burns and smoke inhalation.  Stansberry had

---

[2]     Nivea's birthname was Anthony Roberts.  She was transgender, preferred female pronouns, and called herself Nivea, which we use throughout.  Flaco was Robert Fernandez's street name.  Nivea and Flaco were the alleged victims of the attempted murders charged in counts 6 and 7.

burns on 33 percent of her body, and died of carbon monoxide poisoning and smoke inhalation.

The fifth victim, DeAndre Mitchell, had the most severe burns, going through the skin into muscle and bone. He died of his burns and smoke inhalation.

LAFD arson investigator Lance Jimenez first arrived at 9:30 p.m. on the evening of the fire. He surveyed the outside of the building and came back early the next morning when the light was better and the fire was completely out. Mitchell's body was still in the lobby by the stairs. Firefighters wrapped the body in a sheet and moved it outside for the coroner.

The building's roof had collapsed and there were severe burn patterns above the windows on the alley side. When the windows were broken, oxygen would rush inside and increase the interior fire. Jimenez went in through the garage and saw the power lines had been cut. The fire had started on the second floor and worked its way down the stairs and out through the roof, and had been most severe on the alley side of the building.

Jimenez saw a very severe burn pattern in the second-floor hallway, alerting him the fire may have started there. The front corner of the upstairs exterior facing Eighth Street and the alley had similarly heavy fire damage. He believed two separate fires had started in the second-story hall and then moved into the rooms.

Jimenez looked for anything that could have started or accelerated the blazes, eliminating an electrical cause because the power was out. He found no candles or candle wax, burnt cigarettes, or cooking devices. Nothing showed the fires were natural or accidental. His opinion was the fire was incendiary, with two separate fires intentionally set at the same time.

Someone took an open flame to available combustibles, and the fires burned rapidly. A K-9 detected no accelerants such as gasoline or lighter fluid, and Jimenez found no gas cans. Trash throughout the building could ignite and feed the fire, and some of the trash might have been piled up before being set on fire.

On cross-examination, defense counsel asked Jimenez if a red bottle appearing in a photograph of the first-floor landing could be a can of gasoline. Jimenez responded he had no idea.

b.      *Building residents and eyewitnesses*

i.      *Nivea*

Nivea testified about 10 people lived in the building off and on, including Sanchez, Mitchell (whose nickname was Jokerface), a homeless couple, and Jared Muse. Other people came to party or hang out, and Nivea had spent the night in the building. Sanchez was always there. He stayed in one of the former offices on the second floor. A month before the fire, Nivea asked Sanchez's girlfriend if she wanted to smoke meth, and Sanchez slapped his girlfriend in the face. After that, Sanchez was always hostile to Nivea and would tell her to get the fuck out of the building.

On the day of the fire, Nivea arrived at the building before sundown. She came in through the only entry, a hole in the carport gate, and walked up the front steps. Once inside, she entered one of the rooms and walked through a hole in the wall into a dark room, where she saw Sanchez. A file cabinet blocked the door on the other side of the room and she asked him to move it. In Spanish and broken English, he yelled at her to go back the way she came, and threatened to chop her up with a machete. Nivea hit him on the forehead with a small flashlight, and Sanchez threw a punch. She sprayed him with Mace and

7

he started to yell and scream.  She picked up what she thought was her phone (but picked up Sanchez's phone by mistake), moved the file cabinet, and walked through the door into the hallway.

Nivea's friend Flaco was in the hallway.  He asked her what was happening, and she told him she had fought with Sanchez.  They went into Flaco's room next door, and he closed and locked the wooden and screen doors.  There was a pile of trash two feet high out in the hall in front of the door.  Nivea could hear Sanchez outside the room screaming he was going to kill her, and it sounded like he was throwing metal file cabinet drawers.

Nivea and Flaco talked for some time, while Sanchez kept screaming.  Sanchez stopped, and a minute or two later, Nivea walked over to the window and saw a crowd of people across the street, filming the building with their cell phones and tablets.  Smoke was coming from the top of the building.  She told Flaco it looked like the building was on fire.  He opened the door to the hall, but the trash pile right outside the door was in flames and blocked their exit.  A friend in the alley called "Bum" threw a fire extinguisher up to Flaco, but it was empty.  After the fire department sawed the bars on the window, Nivea and Flaco escaped down the ladder.

Sanchez stood in the middle of the alley.  Nivea pointed at him and yelled:  " 'He did it.' "  Her friends started to beat Sanchez up, and he ran back into the burning building.  The detectives had Nivea and Flaco sit on the curb.  Nivea saw Sanchez come back out of the building, his shirt wrapped around his nose and mouth.  Nivea told a police officer Sanchez started

the fire, and the officer handcuffed him and put him in the back of a patrol car.

ii.    *Flaco*

Flaco lived in a room in the building for three months. He had his own lock and a security system to prevent anyone from prying the lock open.  Sanchez lived in the room next to his, and Nivea stayed in a room across the hall.  Four people from Iowa and an African-American also lived in the building.

On the day of the fire, Flaco heard Sanchez and Nivea arguing in Spanish and English, throwing things, and fighting for five to 10 minutes, because Sanchez wouldn't let Nivea go through his room to get to her room.  He opened his door when Nivea came out and invited her into his room, locking and bolting the door.  They talked for about 15 minutes, while Sanchez continued to threaten to kill Nivea and chop her up with a machete.  Nivea noticed people filming the building, and Flaco looked out and saw smoke.  When he opened his door, he saw smoke and flames coming from the pile of trash in the hall. He closed the door and gathered his things.  The firefighters broke the window and helped Nivea and Flaco down the ladder.

Once outside, Flaco could hear Muse screaming from inside the building.  Sanchez came out of the alley and walked toward the street.  When people pointed him out, Sanchez ran back into the building.  He came back out with his nose and mouth covered, and was arrested.

iii.    *Jared Muse*

Muse lived in the building for three to six months.  He shared with Jokerface (Mitchell) a large divided room on the second floor facing the alley.  Muse had seen Sanchez in the garage and once or twice inside a room.

On the day of the fire, Muse entered the building around sunset.  He and Mitchell were in the room with the door open when they noticed smoke on the ceiling.  Mitchell ran into the hall and screamed, and smoke started to fill the room.  Muse punched the window glass out, cutting his arm, and called for help.  Firefighters sawed the bars off the window and brought him down the ladder.

After Muse was rescued, he saw Sanchez leave the garage through the gate next to the alley and talk to the police.  Muse sat on the curb with Flaco and Nivea before leaving in an ambulance.  The cuts on his arm required stitches and staples.

iv.    *Paulina Mendez*

Paulina Mendez lived in a first-floor apartment across the alley.  At around 7:00 p.m. on the night of the fire, she smelled smoke.  She went into her dining room, looked out of the open window facing the alley, and saw the building on fire.  Sanchez was running back and forth and screaming.  He stopped in front of her window, yelling:  " 'There's somebody I don't like.  I hope he burns.  I hope he dies.' "  He told her if she talked he would burn her house down too.  He went back into the building and then quickly exited with his face covered.  Although she was afraid, Mendez called 911 and identified Sanchez later at the scene.  She still was afraid and reluctant to testify.

Eight days after the fire, Mendez told LAPD Detective Frank Carrillo she asked Sanchez who started the fire, and Sanchez answered in Spanish:  " 'I did, because there's a son of a bitch over there, and I don't like him, and that's why I set it on fire.' "  Sanchez added:  " 'I'm going to burn your house down too, you old bitch,' " and walked toward the corner.  The jury heard Mendez tell the 911 operator:  "[T]he guy who set the building

on fire is a cholo.  And right now since I was telling my kids that he did it, he's threatening me and he's over there all calm.  Because he said that he had to kill everyone who was inside that building."

The day after the fire, two guys who looked like cholos came to her house looking for one of her sons.  One of them said: " 'You know what happens to people who talk.' "  Seven months before trial, she met with the prosecutor, and after that other guys came to her door asking about her son, and men drove by yelling:  " 'Rats, rats, rats die.' "  A woman stopped by and asked her whether she was the one who was going to testify.  Mendez was frightened.

Mendez had four sons:  Jose, Julio, Byron, and Eddie.  Jose went by "Bum," and Julio went by "Virus."  Bum and Virus lived on the streets and came home now and then to shower or eat.  When Mendez saw the fire, she was worried because she didn't know where Virus was, but later she learned he was safe.  She also noticed her fire extinguishers were gone.

2.     *Defense case*

a.     *Sanchez*

Sanchez testified in his own defense.  Six weeks before the fire, he and his girlfriend argued inside the building.  She slapped him, he pushed her back, and a Black transgender person he called "Queen" (Nivea) got between them and told him not to push his girlfriend.  Nivea then asked if his girlfriend wanted to smoke meth, and Sanchez got upset.

On the day of the fire, Sanchez was in a room in the building.  One door was open, and the other was blocked with a file cabinet.  At 3:00 or 4:00 p.m., Nivea came in.  He stopped her from going through the blocked door, and she yelled at him,

hit his left eyebrow with a flashlight, and sprayed him with pepper spray.  He tried to fight back but his eyes burned.  Nivea went back out the open door and Sanchez ran out of the building.  He went to a liquor store for ice but the bags were too big, so he bought ice cream and put it on his eyes.  His left eyebrow was cut and swollen.

At a nearby store, a man Sanchez knew named Jose gave him a clean shirt, and he threw his bloody shirt in the trash.  After 15 to 20 minutes at the store he realized he didn't have his phone, and went back to the building to find it.  He walked through the back of the alley and saw the building was on fire.  Mendez was standing at her window.  She said she'd seen him there before, and asked if he had anything to do with the fire.  He said no, and suggested her sons (who were homeless and stayed in the building) or someone else who lived there might have started it.  Mendez replied:  " 'My son might be crazy, but he's not a dumbass,' " and said she was calling the police.

Mendez commented on Sanchez's cut eyebrow.  He explained he had fought with someone inside a half hour earlier, and " '[i]f . . . that person is there in that place, I don't really care.  Look at what she did to me.' "  Mendez answered:  " 'Oh, so you did it.' "  Sanchez denied starting the fire, and told Mendez that if he wanted to hurt someone, he would use a gun.  He may have said something about "burning" Nivea, but he meant with bullets.

Sanchez could hear people yelling inside the burning building.  Mendez pointed at him and said he started the fire.  Two of her sons started to fight with him for disrespecting their mother.

Thinking a friend was inside, Sanchez went back into the building.  To protect himself from the smoke he took off his shirt

to cover his face. Firefighters blocked him from the second floor and told him to leave.

Outside near the alley, he threw his shirt down and started coughing. Nivea had been rescued, and she pointed at him as if he had caused the fire. The police handcuffed, arrested, and searched him, finding his lighter and the pipe he used to smoke weed. At the police station he met with Detective Carrillo, his partner, and Jimenez, the arson investigator.

On cross-examination, Sanchez claimed he was not homeless but sometimes stayed in the building. He knew Muse lived there but had never met Flaco. The building was abandoned and full of trash, and people could use any room they liked. He wasn't sure which room he was in the night of the fire, but he didn't like Nivea walking through. He argued and fought with her, but he never said he would chop her up with a machete. When he told Mendez he wanted to "burn" Nivea, he meant with bullets.

He left the building to go to the liquor store and get ice for his eyes, walking through the alley. He then went to Jose's store, asked for a clean shirt, and ate. He stayed for less than an hour and went back to the building to find his phone, again walking down the alley, where he talked to Mendez as she stood at her window. He did not remember telling Detective Carrillo he was in the building when the fire started.

b. *Jose Cabrera*

Jose Cabrera testified he worked at a community food bank about a block and a half from the building. Between 3:00 and 3:30 p.m. on the day of the fire, Sanchez came to the store (food bank) wearing a shirt with a little blood on it, and Cabrera gave him a free shirt. Sanchez ate and stayed at the food bank for

13

three hours, leaving around 6:00 or 6:30 p.m.  A week before his testimony, Cabrera had trouble identifying Sanchez in a photo.

c. *Jesse Delgado*

Jesse Delgado was a civilian LAPD employee trained in advanced interrogation techniques.  When he interviewed Sanchez in custody the day after the fire, Sanchez consistently denied he started the fire.

### 3. *Rebuttal*

A Los Angeles County sheriff's deputy with bilingual Spanish certification interpreted during a June 15, 2016 interview with Sanchez.  Sanchez said he was in his second-floor room when someone told him there was a fire, they could smell the smoke, and they needed to evacuate.  A fire on the right of the stairs spread to his room, and he ran out through the heavy smoke.  Sanchez denied he started the fire.

Detective Carrillo testified he obtained and watched video from a surveillance camera.  The video showed the alley and displayed a correct system date, but the time was off by 42 minutes.  The footage captured images on the day of the fire from 1:15 p.m. to 4:00 p.m., and from 5:15 p.m. to 8:46 p.m.  Although Sanchez had testified he walked through the alley when he left the building that afternoon to get ice for his eyes and when he returned from Jose's store, he did not appear in any of the footage until after 7:00 p.m., when a man wearing clothing matching what Sanchez wore walked north in the alley, and shortly thereafter ran back southbound.  The prosecution showed the jury two screenshots of the empty alley, and the defense showed the jury two screenshots of the man walking in the alley, but the video was not admitted into evidence.

14

During two interviews on June 14, Sanchez did not say that he went to Jose's store, that he went back to the building to get his phone, or that he told Mendez he had nothing to do with the fire. Sanchez said Nivea left the building, the fire started, and then he and others ran out of the building. He was angry that Nivea got out first. He blamed two of Mendez's sons for the fire, and then said Nivea started the fire. He thought it started with gasoline.

## 4. *Verdict and sentencing*

The jury convicted Sanchez on all seven counts and found true the special circumstances. After denying Sanchez's motion for new trial, the court sentenced Sanchez to five concurrent terms of life without the possibility of parole on the murder counts, and consecutive sentences of life imprisonment on each of the two counts of attempted murder (Nivea and Flaco). The court also awarded custody credits and imposed restitution, fines, and fees.

Sanchez filed this timely appeal.

## DISCUSSION

## 1. *Juror misconduct does not require reversal*

### a. *Post-verdict proceedings*

After the jury convicted Sanchez on all counts, Sanchez filed a petition for an order disclosing juror information. Defense counsel had learned an alternate juror (the alternate) told two deputy district attorneys (DAs) she ate lunch with deliberating jurors. Counsel believed misconduct had occurred. In opposition, the prosecutor argued the petition was based on hearsay and did not show good cause to disclose the information. The trial court denied the petition for disclosure without prejudice because it was not supported by declarations.

15

Sanchez filed a second petition, attaching an email from DA Leslie Hinshaw stating the alternate was a civilian employee of the sheriff's department who provided security on the DAs' floor. DA Hinshaw knew the alternate had been on jury duty, and when she saw her back at work and talking to DA Jane Brownstone, she asked if the case was over and what kind of case it was. The alternate replied it was a 2016 arson with five decedents, and the jury convicted, but: " 'Jurors are so retarded though. They're so retarded. They were initially hung 7-5, and I was like, "We need to all have lunch together." ' " At lunch, she told the other jurors about the kill zone and that Sanchez did it. The jurors went back to deliberating, hung 10-2, and finally convicted. DA Hinshaw told the alternate she wished she hadn't shared that, and she and DA Brownstone walked away.

DA Brownstone's email confirmed the alternate was assigned to the security desk in her lobby. The alternate volunteered the jury was "retarded," was hung 5-7 or 7-5, and said: "I was like we need to go to lunch and I explained to him how this guy basically created a kill zone." DA Brownstone asked if the alternate had been substituted in to deliberate. When she answered she had not, the DAs ended the conversation, believing the alternate might have inadvertently disclosed juror misconduct.

The trial court found good cause to set a hearing on the second petition, and sent notice to all the jurors and alternate jurors. At the initial hearing, the alternate testified she went to lunch with the other alternate jurors, but she did not remember going to lunch with other jurors. No juror ever told her of a split, and she did not recall sharing that information with any DAs, or saying the jury was "retarded" and she needed to go to lunch

16

with them.  She did not remember speaking to any deliberating jurors or to the DAs.

DA Brownstone testified she did not ask the alternate how she knew the jury was split.  She later spoke with her superior because she was concerned.  DA Hinshaw testified she thought the alternate's statement that she talked to other jurors about the kill zone meant the alternate told them Sanchez was guilty.  Afterwards she told DA Brownstone the alternate juror "had potentially spoken to deliberating jurors during trial" at lunchtime, and then the jurors returned to deliberating.  This was misconduct, so DA Brownstone alerted her supervisor.

The trial court stated it was not ready to rule whether misconduct had occurred, but would only decide whether to disclose juror identifying information.  The court could not tell whether the alternate went to lunch or was exaggerating her role in the conviction, but found the DAs were credible.  "I cannot conclude that anything actually did happen, but I do find that we need to determine whether or not anything happened."  The court set a further hearing to question all the jurors.

b.    *Juror testimony*

On July 19, 2019, the trial court questioned six jurors under oath one by one, outside the presence of the others.  Sanchez had been tased after getting into a fight downstairs, and was not present.  All six jurors testified they did not remember having lunch with the alternate or any other contact during deliberations, did not discuss the case outside the jury room, and did not know of another juror who did so.

The court held another hearing a month later with all but one of the remaining jurors.  Sanchez was present.  Four jurors testified they had no contact with the alternate during

17

deliberations, and knew of no other jurors who had contact with the alternate or discussed the case outside the jury room.

Juror No. 2 had been an alternate juror (No. 36) and was substituted onto the regular panel during trial. After deliberations began, she continued to have lunch with the two remaining alternate jurors at the park or the farmer's market.

A group of three to five jurors had always gathered to go to lunch and talk. Before deliberations began, they went to the farmer's market, where the alternate was adamant that Sanchez was "guilty, guilty, guilty." "It was like her mind was made up." Asked if this continued during deliberations, Juror No. 2 replied: "I think so. I mean, I don't—you know. I just kind of kept my distance with her." The alternate was "chitchatting" and saying: " '[t]his is a waste of time,' " and " '[h]e's guilty.' " The alternate said things like: " 'I'm in the building.' 'I know.' 'I know.' " It could have been on a Thursday before deliberations began; Juror No. 2 could not remember.

The prosecutor pointed out closing argument ended on Wednesday before lunch, and deliberations began after lunch. The only lunch period during deliberations would have been the next day, Thursday, and at 1:31 p.m. that day the jury buzzed that they had reached a verdict. Juror No. 2 testified she could not remember whether they went to lunch at the farmer's market on the Thursday during deliberations. "I'm not 100 percent. It wouldn't surprise me if it was. Do you know what I mean? I'm not going to say 100 percent yes. It's like 60 percent yes, 40 percent no." Asked again if they had lunch together after deliberations began, the juror said: "I wouldn't be surprised. Put it that way." Juror No. 2 continued: "I don't know. I mean, I'm not 100 percent sure. Just based on her personality how

18

she was all the time, it was just set in stone. I mean, it could have come up." Juror No. 2 did not remember whether the earlier vote splits (which tapered over time toward guilty) had been discussed during a lunch with the alternate present. The jurors who held out for innocence were not at the lunch.

The alternate never discussed specific facts or theories, such as the "kill zone." She would just plop herself down and say this was ridiculous and a waste of time, because " '[h]e's guilty already.' " The alternate's views did not in any way affect Juror No. 2's deliberations or come up in the jury room.

Juror No. 31, the other alternate juror, testified he had lunch with four or five jurors, including Juror No. 2 and the alternate, on the Thursday after deliberations began. The jurors talked about how many more days they had to be there. Juror No. 31 heard nothing about a numerical split and did not hear the alternate give her opinion. When Juror No. 31 and the alternate were on their own on Wednesday before deliberations began, the alternate said she would find Sanchez guilty, but said nothing specific about the case. The alternate never mentioned talking to the deliberating jurors. Juror No. 31 never heard anything about how the votes were going.

The last juror testified on September 12, 2019, with Sanchez present. The juror had no contact with the alternate jurors once deliberations began, knew of no deliberating jurors having such contact with alternate jurors, heard no deliberating juror say they had discussed the case during the trial with anyone outside the jury, and heard no new information about the kill zone.

19

c. *Motion for new trial*

Sanchez filed a motion for new trial, arguing the alternate knew about the vote splits, and must have gotten the information from "a deliberating juror who broke his/her oath." As no juror admitted to disclosing the information, "the jurors are lying to the court. Lying about 'the lunch,' lying about revealing how they were divided, lying about their inappropriate conversations outside of the deliberation room about theories, evidence, and their opinions." The DAs were reliable, and the alternate lied when she said she did not remember telling the DAs about the deliberations. Juror misconduct included the alternate's interaction with the deliberating jurors; the deliberating jurors sharing information about the vote splits and theories of liability; and the alternate's use of her "elevated status" protecting prosecutors to intimidate and influence the other jurors. The easy way out would be to believe the jurors' sworn testimony they had not heard anything from an outside source or relayed information about deliberations. But something improper occurred and the jury was covering it up.

In opposition, the prosecution argued there was no competent evidence of juror misconduct. While the content of the alternate's statements was admissible to show overt misconduct, under Evidence Code section 1150, subdivision (a), the statements were not admissible to show an effect on the jurors' subjective mental processes. If the court decided the statements were misconduct, any presumption of prejudice was rebutted as there was no showing the jury discussed the alternate's statements in the jury room.

Sanchez waived his presence at the hearing on the new trial motion. His counsel argued the alternate must have learned

20

about the vote split sometime between Wednesday afternoon and lunchtime on Thursday. Although the alternate and the jurors testified under oath they did not talk about the split, the trial court should "rely on its gut, experience" despite the jurors' "complete denials" that they had improper conversations with or were influenced by the alternate. The alternate was in a position of authority and the other jurors could believe she had inside information. The prosecution had the burden to prove that the alternate did not get the information about the vote split from the deliberating jurors.

The prosecutor argued that, even taking as true the DAs' testimony about their conversation with the alternate, what the alternate described to the DAs was inconsistent with the jurors' sworn testimony. The jurors had not been split 10-2 until after lunch on Thursday, so if the alternate had inside information about the deliberations, it came from a conversation after the verdict. Only Juror No. 2 testified she heard the alternate's opinions, and she denied ever discussing those opinions during deliberations. No prejudice occurred, because it was not substantially likely one or more deliberating jurors was actually biased against Sanchez.

The trial court found the alternate committed misconduct when during the trial she repeatedly insisted Sanchez was guilty. The court had repeatedly instructed the jury not to form or express an opinion.

But the extent of the misconduct, and its impact, were a different issue. The jury started deliberations after lunch on Wednesday, sent a note at the end of the day, and were released at 4:15 p.m. The jurors returned Thursday morning to resume deliberations. At 10:45 a.m. they heard the readback they had

requested. The readback ended at 10:56 a.m. and they resumed deliberations. At 11:40 a.m., they submitted a second question and broke for the noon hour. They returned at 1:41 p.m. and heard a second readback. At 1:42 p.m. they resumed deliberations, and at 2:06 p.m. they reached a verdict.

It was not clear whether the alternate accurately described the vote split. None of the jurors testified they discussed any split with the alternate. They would have had very little time or opportunity to do so. There was no evidence of communication such as texts between the jury and the alternate. The jurors testified they did not discuss any of the alternate's opinions during deliberations.

The only deliberating juror who testified the alternate shared her opinions was Juror No. 2. While other jurors might have been present, they may not have heard the conversation.

The alternate's credibility was "seriously in question," and the court did not believe events happened as the alternate described them to the DAs. No evidence showed the jurors and the alternate discussed the facts of the case during the trial or during deliberations. The holdout jurors were not at the Thursday lunch. Some jurors testified they did not sit together at the Thursday farmer's market, and nothing from that lunch was shared with jurors who were not present. Juror No. 2 was credible, and her testimony was borne out by the other jurors.

The court concluded the alternate's opinions were not shared or communicated during deliberations. The misconduct did not affect the jury's verdict and Sanchez was not prejudiced. The case against him was "rather strong" and supported by "a tremendous amount of evidence." The jury quickly reached

22

a verdict after the readback, and "I don't believe they reached a verdict based on what transpired at that lunch."

## 2. *The alternate's misconduct did not prejudice Sanchez*

"A criminal defendant is constitutionally entitled to an unbiased, impartial jury. [Citation.] 'Jurors must be admonished not to "form or express any opinion about the case until the cause is finally submitted to them." (§ 1122, subd. (b).) Prejudgment "constitute[s] serious misconduct" [citation], raising a presumption of prejudice. The presumption is rebutted "if the entire record . . . indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." ' " (*People v. Fayed* (2020) 9 Cal.5th 147, 174.) We review independently the mixed question of law and fact whether jury misconduct was prejudicial. (*People v. Weatherton* (2014) 59 Cal.4th 589, 598.)

"Jury misconduct serious and extensive enough to impair the fairness of the trial or deliberations may warrant granting a new trial motion. [Citations.] Where the trial court has heard evidence and made findings of historical fact regarding the alleged misconduct, we accept those findings if they are supported by substantial evidence." (*People v. Flinner* (2020) 10 Cal.5th 686, 755-756.) We do not reweigh the trial court's credibility determinations when supported by substantial evidence. (*People v. Merriman* (2014) 60 Cal.4th 1, 100.) A trial judge who observes and speaks with a juror gathers from the juror's confidence and demeanor valuable information that does not appear in the appellate record. (*Id.* at p. 101.)

We agree with the trial court that the alternate committed misconduct when she expressed her belief in Sanchez's guilt to Juror No. 2, the only deliberating juror who testified she heard

23

the alternate's opinions.  Juror No. 2 was also the only juror who heard the alternate say she worked in the building (which Sanchez characterizes as claiming special knowledge).  We do not second-guess the trial court's conclusion that Juror No. 2 was credible when she testified under oath that none of the alternate's statements in any way affected her deliberations, or came up in the jury room.  Juror No. 31, the other alternate, testified he heard the alternate express her opinion when they were alone before the start of deliberations.  Juror No. 31 and the alternate did not participate in the deliberations.  Although Sanchez's new trial motion repeatedly accused all the jurors of lying about their own and the alternate's conduct, we repeat we do not reweigh the trial court's credibility determinations. Defense counsel urged the trial court to "rely on its gut, experience" despite the jurors' testimony they did not have improper conversations and were not influenced by the alternate. But the trial court's instinct and experience led it to believe the jurors' sworn testimony.  Each juror testified outside the hearing of the others, and substantial evidence supports the court's decision to believe them.

Sanchez argues another basis for a finding of misconduct: one or more of the deliberating jurors must have shared the vote counts with the alternate, who then repeated them to the DAs.  He argues the court failed to ask the deliberating jurors about the vote splits and whether they discussed the splits with the alternate.  Yet all the deliberating jurors except Juror No. 2 testified they did not remember any contact with the alternate after deliberations began, and did not discuss the case with her.  Juror No. 2 did not remember whether she had lunch with the alternate on the Thursday before or after deliberations

24

began, and did not remember whether vote splits had been discussed. And given the timeline, the 10-2 split likely was after lunch on the Thursday during deliberations, and so the alternate could have learned of that split only after the verdict. Substantial evidence supports that factual finding.

Sanchez also argues once Juror No. 2 testified the alternate said Sanchez was guilty at a lunch before deliberations began, the court should have recalled all the other jurors to ask if they heard the alternate's opinions during trial. He forfeited this claim by not asking for additional inquiry into the prejudicial effect of the alternate's misconduct. (*People v. Bell* (2019) 7 Cal.5th 70, 120; *People v. Holloway* (2004) 33 Cal.4th 96, 126-127.)

We have read the entire record. We agree with the trial court's finding that the presumption of prejudice was rebutted, as we see no reasonable likelihood that any of the deliberating jurors was biased against Sanchez.[3]

### 3. *Sanchez's absence during juror testimony did not violate his constitutional rights*

At the start of the July 19 hearing, the court stated: "Mr. Sanchez got in a fight downstairs, and he was tased and he was taken to medical to be cleared. I am not waiting for him. I intend to proceed. [¶] This [hearing] is basically in lieu of giving up the names and having investigators go out and take

---

[3] The trial court also commented on the strength of the case against Sanchez. Under some circumstances, the strength of the evidence at trial is relevant to assessing whether jury misconduct prejudiced the defendant. (*People v. Solorio* (2017) 17 Cal.App.5th 398, 408.) This was not the basis for the trial court's ruling, nor is it the reason we affirm.

declarations.  He wouldn't be present there anyway."  Defense counsel objected that the court should wait.  The court responded it had gone to great lengths to get the jurors to come to court, and "[w]e'll try to get him here in a timely fashion. [¶] But if we don't get him here, then I intend to proceed. . . .  I'm going to put them under oath because this is in lieu of affidavits, and affidavits are signed under penalty of perjury."  The hearing was intended to be less intrusive for the jurors, so the court would proceed without Sanchez.

When the court reconvened the hearing on second call at 9:30 a.m., defense counsel objected to continuing in Sanchez's absence and added:  "[H]e should be here soon."  The court stated the questions it had received from both counsel were extensive, and it would focus on the issues raised at the previous hearing. Each of the six jurors stated they did not remember having lunch with alternate jurors during deliberations or hearing any juror discuss the case outside the jury room.

"A criminal defendant accused of a felony has the constitutional right to be present at every critical stage of the trial, including during the taking of evidence."  (*People v. Bell*, *supra*, 7 Cal.5th at p. 114.)  A competent defendant may waive that right if the waiver is knowing, intelligent, and voluntary, and an unduly disruptive defendant may be removed from the courtroom if after a warning by the court he continues his disruptive behavior.  (*Id*. at pp. 116-117.)  The right to be present exists only at *critical* stages of the trial, " 'in which a defendant's " 'absence might frustrate the fairness of the proceedings' [citation], or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge' [citation]." ' "  (*Id*. at p. 118.)

" 'The defense has no constitutional right to be present at every interaction between a judge and a juror.' " (*United States v. Gagnon* (1985) 470 U.S. 522, 526.)  Due process requires presence " 'to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' " (*Ibid.*)  Even if he has the right to be present, a defendant has the burden to demonstrate his absence prejudiced his case or denied him a fair trial.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1357.)

The hearing took place after the guilty verdicts, and was designed to serve as a replacement for an investigator's interview of the jurors.  Sanchez had been brought to the courthouse to attend, but got into a fight at the courthouse just before the hearing and had been tased.  Six jurors were waiting to be questioned, and the court proceeded with questions proposed by both sides.  Given these circumstances, we conclude the hearing was not a critical stage of the trial at which Sanchez's presence was constitutionally required.

Sanchez cites *Walker v. Lockhart* (8th Cir. 1988) 852 F.2d 379 (*Walker*).  *Walker* addressed ineffective assistance of counsel. During the testimony of his accomplice at Walker's trial for capital murder, an unknown woman walked into the jury room to get a cup of coffee, and remarked she could kill both men. After two jurors told the court about the intrusion, the court conducted an in camera voir dire of each juror with only counsel present.  Walker's counsel stated he was satisfied from the jurors' responses they would deliberate based only on the evidence, and declined to request a mistrial.  The trial continued and the jury convicted Walker.  He did not learn of the intrusion or the voir dire until he was in prison, and eventually filed a federal habeas petition alleging ineffective assistance based on counsel's

27

failure to request a mistrial.  (*Id.* at pp. 380-381.)  The court of appeals concluded counsel had made a reasoned strategic decision.  (*Id.* at p. 382.)

In examining Walker's ineffective assistance of counsel claim (based on counsel's failure to request a mistrial), the court stated:  "We recognize Walker had a constitutional right to be present at the in camera voir dire of the jury."  (*Walker*, *supra*, 852 F.2d at pp. 381-382.)  This statement is not supported by Supreme Court or other authority.  (See *United States v. Gagnon*, *supra*, 470 U.S. 522; *Johnson v. Cullen* (N.D.Cal. 2010) 704 F.Supp.2d 869, 914.)  In *People v. Abbott* (1956) 47 Cal.2d 362, the trial court questioned a juror in chambers with the attorneys present over a defense objection that the examination of the juror should take place in open court.  The court then discharged the juror in open court and denied the defendant's motion for mistrial.  (*Id.* at pp. 371-372.)  "It was not error to conduct the proceedings in chambers in Abbott's absence. . . .  [I]t is settled that the presence of a defendant is required only where it has a reasonably substantial relation to the fullness of his opportunity to defend against the charge.  [Citations.]  The absence of Abbott during the proceeding in chambers could not have affected his right to a fair trial."  (*Id.* at p. 372.)

Even if the hearing were a critical stage of the proceedings, Sanchez has not demonstrated prejudice to his full ability to defend against the murder and attempted murder charges of which he already had been convicted.  The hearing was one of four on the juror misconduct issue.  Sanchez was present at the hearing when the alternate and the DAs were questioned, and was present at the third and fourth hearings when the other jurors were examined.  His argument that he was necessarily

28

prejudiced because his presence would elicit more truthful testimony presumes rather than demonstrates prejudice.

4. ***Sufficient evidence supported the verdict on count 7 and the instruction given does not require reversal***

In moving for a new trial, defense counsel argued insufficient evidence supported Sanchez's conviction on count 7 (attempted murder of Flaco). No evidence showed Sanchez knew Flaco was in the room when he allegedly lit the fire, and under *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), the prosecution was required to prove Sanchez "want[ed] and [was] willing to kill everyone [Flaco] in order to kill the target [Nivea]." The prosecutor responded that Sanchez had stayed in the building for a while, and when he set the trash on fire outside the door to what he knew to be Flaco's room, Sanchez also knew anyone inside was in the zone of fatal harm.

The court concluded the evidence supported a finding that in order to kill Nivea, Sanchez intended to kill everyone in Flaco's room by setting two fires in such a way that no one inside could escape. The jury could draw the reasonable inference that Sanchez knew that Flaco was in his room with Nivea.

On appeal, Sanchez argues the "kill zone" doctrine requires that the only reasonable inference from the evidence be that Sanchez intended to kill everyone in the room to guarantee the death of the primary target. Here there was another reasonable inference—Sanchez intended to kill only Nivea, but in carrying out that intent he callously and recklessly endangered others. We disagree.

In *Canizales*, decided after the guilty verdicts but before Sanchez was sentenced, the California Supreme Court held: "[T]he kill zone theory for establishing the specific intent to kill

29

required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) "The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Id*. at p. 608.) Relevant circumstances include the type of weapon used, the distance between the defendant and the alleged victim, and the alleged victim's proximity to the primary target. (*Id*. at p. 607.) We examine the record to determine whether it contains substantial evidence to support the inference that Sanchez intended to kill everyone in Flaco's room in order to kill Nivea. (*Id*. at p. 609; *People v. Cerda* (2020) 45 Cal.App.5th 1, 16 (*Cerda*), review granted May 13, 2020, S260915.)

The scope of the kill zone is the area in which the defendant intended to kill everyone, not merely the area in which other people were at risk. (*Cerda*, *supra*, 45 Cal.App.5th at p. 19.) Whether the nonprimary target's egress was constricted is a relevant consideration. (*In re Rayford* (2020) 50 Cal.App.5th 754, 780.) And " '[w]hether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims were actually within the zone of harm.' " (*Cerda*, at p. 20.) While the defendant's

awareness of the victim's location is relevant, it is not dispositive as it might be when the magnitude of the attack is limited, as when a shooter fires a single shot. (*Ibid.*)

The prosecution presented evidence that after Sanchez fought with Nivea she went into the hallway, where Flaco let her into his room next door and closed and locked the door. While Sanchez continued to scream outside the door that he would kill Nivea, she and Flaco talked for some time. Shortly after they no longer heard Sanchez screaming, they realized the pile of trash outside the door had been set on fire. The room's exit to the hall was blocked by the flames. Bars on the window prevented their escape until a firefighter sawed through the bars and helped them down a ladder.

Substantial evidence supported only one reasonable inference: Sanchez intended to kill everyone in Flaco's room when he set the fire just outside the locked door. Sanchez knew his primary target, Nivea, was inside the room, and although the evidence also supports the inference he knew Flaco was inside, it is enough that Flaco was trapped inside the room with Nivea. And Sanchez telegraphed his intent. Both Nivea and Flaco heard him yelling he was going to kill Nivea. Mendez testified she heard Sanchez yelling that he hoped someone he didn't like burned and died. She told the 911 operator Sanchez said he had to kill everyone inside the building. Although Sanchez argues that setting fire to a commercial building creates a risk too unpredictable to justify a kill zone instruction, here the prosecution argued the zone of danger was Flaco's room (and Sanchez was not charged with the attempted murder of Muse, who escaped the fire through the window of another room in the burning building). It would be unreasonable to infer that

31

Sanchez intended to kill only Nivea and not anyone else inside Flaco's room. The evidence supported a guilty verdict on count 7.

Sanchez argues even if a kill zone instruction was supported by the evidence, the trial court erred when it gave CALCRIM No. 600, which is "incorrect and inadequate."[4] The instruction was taken from CALCRIM No. 600:

> "A person may intend to kill a specific person or victims and at the same time intend to kill everyone in a particular zone of harm, or a kill zone. [¶] In order to convict the defendant of the attempted murder of Robert Fernandez, also known as Flaco, the People must prove that the defendant not only intended to kill Anthony Roberts [Nivea], but also either intended to kill Robert Fernandez or intended to kill everyone within the kill zone. [¶] If you have a reasonable doubt whether the defendant intended to kill Robert Fernandez or intended to kill Anthony Roberts by killing everyone in the kill zone, then you must find the defendant not guilty of attempted murder of Robert Fernandez."

Sanchez cites *Canizales* and *In re Rayford*, but in both cases (unlike here), the evidence was found insufficient to support a kill zone instruction. *Canizales* expressly declined to invalidate the standard CALCRIM No. 600, because the evidence did not support the instruction. (*Canizales*, *supra*, 7 Cal.5th at pp. 597-

---

[4]    Sanchez did not object to the instruction, but the jury was instructed and returned its verdicts before *Canizales* was decided.

598.) The Court added that "when a kill zone instruction is legally warranted and in fact provided, the standard instruction should be revised to better describe the contours and limits of the kill zone theory as we have laid them out here." (*Id*. at p. 609.) In *Rayford*, the instruction defined the kill zone only as " 'a particular zone of risk,' " and did not tell the jury that the defendants must have *intended* to kill the other individuals in the kill zone, instead allowing conviction if they intended merely to expose the others to a risk of harm. (*Rayford*, *supra*, 50 Cal.App.5th at pp. 782-783.) Here the instruction did tell the jury Sanchez must have intended to kill Flaco as well as Nivea, not merely expose Flaco to harm.

Even if CALCRIM No. 600 as given were invalid when (as here) sufficient evidence supports a kill zone instruction, in this case the error is harmless beyond a reasonable doubt. If a court instructs the jury on an invalid theory as well as a valid theory, reversal is not required if after examining the entire record, it is clear beyond a reasonable doubt that jurors would have reached the same verdict. (*People v. Aldemat* (2019) 8 Cal.5th 1, 13.) The jury was instructed on the valid theory that it could find Sanchez guilty of attempted murder if he specifically intended to kill Flaco. It is clear beyond a reasonable doubt that the jury would have convicted Sanchez of attempted murder because he intended to kill Flaco. He set fire to a big pile of trash in the second-floor hall directly outside the door of Flaco's adjoining room; he set another fire in another area of the hall; and Mendez told the operator Sanchez said he had to kill everyone in the building. Given the evidence that Sanchez set a blaze in the hall blocking anyone from exiting Flaco's second-

33

story, locked room, even without a kill zone instruction, the jurors would have reached the same verdict of guilty on count 7.

**5.** ***The trial court's evidentiary rulings were not an abuse of discretion***

Sanchez argues the trial court abused its discretion when it excluded evidence of prior fires in the building, and when it admitted the surveillance video into evidence.

a.    *Prior fires*

In its trial brief, the prosecution noted witness statements that there had been three previous fires at the building, and "[e]vidence of any prior fires at that location are not relevant." At a hearing, defense counsel argued the prior fires were relevant, anticipating the arson investigator would "say that the homeless population is more careless." The prosecutor argued prior fires were not relevant. The defense had offered as a witness the building manager, who would testify that shortly before the fire, a male Hispanic had approached him with an offer to help burn the building down. The court ruled that more was required to show third-party culpability, and agreed to allow the defense to ask the investigator if the likelihood of accidental fire was greater when homeless people were staying in the building, and until the court heard the answer it would not decide whether any previous fires were relevant to the cause of the June 13 fire.

During trial, LAFD Chief Moore testified that homeless people starting fires was not a concern. Later, the defense renewed its argument about the fires and asked to recall Chief Moore. Defense counsel also asked the arson investigator Jimenez whether homeless people could be careless with cigarettes and cause a fire, and the court sustained a relevance objection by the prosecutor.

34

Sanchez argues that fires were "shockingly common" in the building and the court violated the law and the federal constitution when it excluded evidence of earlier fires, because that evidence would make the jury more likely to conclude someone else had started the June 13 fire.

Third-party culpability evidence is admissible if relevant and if its probative value is not substantially outweighed by risk of undue delay, prejudice, or confusion. (*People v. Turner* (2020) 10 Cal.5th 786, 816.) "[A]dmissible evidence of this nature points to the culpability of a *specific* third party, not the possibility that some unidentified third party could have committed the crime," and there must exist direct or circumstantial evidence linking the third person to the actual perpetration of the crime. (*Id.* at pp. 816-817.) Review is for abuse of discretion. (*Id.* at p. 817.)

The court did not abuse its discretion when it excluded evidence of prior fires intended to show someone else set the June 13 fire. No direct or circumstantial evidence linked any specific third party to the fire. And the court's "reasonable application of the rules of evidence to exclude irrelevant and potentially misleading information did not deprive defendant of his constitutional rights." (*People v. Turner*, *supra*, 10 Cal.5th at p. 818.)

b. *Surveillance video*

Out of the presence of the jury, Detective Carrillo testified that on June 21, 2016, he and his partner obtained surveillance video of the alley next to the building. The date stamp on the screen was correct, but the time was 42 minutes ahead. Over defense objection, the trial court admitted the video, because the time differential went to its weight rather than admissibility. During rebuttal, Detective Carrillo testified the

35

video from the day of the fire (obtained a week later) did not show Sanchez in the alley when he had claimed to be coming back from Jose's store, and explained the 42-minute time differential to the jury.  The jury saw two exhibits of still images from the video.

Sanchez argues there was no adequate foundation for the evidence because Detective Carrillo obtained the video eight days after the fire, and had no personal knowledge how the camera recorded activity in the alley on the day of the fire.

No "elaborate showing of accuracy is required" for admission of automatically produced photographs and contemporaneously recorded data.  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 272.)  Even perceived inaccuracies and errors go to the weight of the evidence, not its admissibility.  (*Ibid.*)  No greater showing of authentication (such as expert testimony) is required to admit digital images simply because they theoretically can be manipulated.  (*Ibid.*; *People v. Tran* (2020) 50 Cal.App.5th 171, 191.)  The jury could decide what weight to give the testimony and the photo stills, given Detective Carrillo's description of when he obtained the surveillance video and his explanation of the time display differential.  No abuse of discretion occurred.

6. ***Sanchez has waived his claim of prosecutorial misconduct and his counsel's failure to object was not ineffective assistance***

In closing argument, defense counsel told the jury the fire department was more concerned with putting out the fire than with preserving evidence.  He argued two photographic exhibits showed a cigarette lighter and a gas can at the scene, which suggested someone else may have started the fire, and asked why that evidence was not preserved.  In rebuttal, the prosecutor said:

"He pointed to something in that photograph, he said see that's a lighter. We don't know that. And in the jury instruction you're instructed not to speculate. No one testified that was a lighter. And you're not allowed to speculate as to what it is, it's not allowed. You're only allowed to analyze actual evidence based upon the testimony that came out of the witnesses in court. And regarding the can, it could or could not be a gas can. Could be something else. Potentially a detergent container. We don't know. And that's the whole point. You can't speculate."

Defense counsel did not object.

Sanchez now argues the prosecutor committed misconduct by telling the jurors they could not independently evaluate the photographic evidence. Making a timely and specific objection and requesting the jury be admonished "is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.) He has forfeited this claim.

Sanchez argues counsel's failure to object was ineffective assistance. Ineffective assistance requires prejudice which " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 366.) The prosecutor's statement that the jurors could not speculate about what they saw in the photographs without witness testimony did not make the trial fundamentally unfair. The evidence that Sanchez set the fire was strong, including his

37

own statements.  The presence or absence of a lighter or gas can after the fire was out neither proves nor disproves Sanchez's guilt.  We see no possible prejudice.

**7.**     ***Cumulative error does not require reversal***

As we have found no error, we reject Sanchez's argument that cumulative error requires reversal.

### DISPOSITION

The judgment is affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

LAVIN, Acting P. J.

ADAMS, J.*

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.